## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ENVIRONMENTAL INTEGRITY PROJECT,<br>1000 Vermont Avenue NW, Suite 1100<br>Washington, DC 20005, | ) <br> ) <br> ) <br> ) <br> ) |
| NATURAL RESOURCES DEFENSE COUNCIL,<br>INC.<br>40 West 20th Street<br>New York, NY 10011, | ) <br> ) <br> ) <br> ) <br> ) |
| EARTHWORKS,<br>1612 K Street, NW, Suite 808<br>Washington, DC 20006, | ) Civil Action No. 1:16-cv-842<br> ) <br> ) **COMPLAINT FOR DECLARATORY** |
| CENTER FOR HEALTH, ENVIRONMENT<br>AND JUSTICE,<br>105 Rowell Court, 1st Floor<br>Falls Church, VA 22046, | ) **AND INJUNCTIVE RELIEF**<br> ) <br> ) <br> ) <br> ) <br> ) |
| WEST VIRGINIA CITIZEN ACTION GROUP<br>D/B/A WEST VIRGINIA SURFACE OWNERS'<br>RIGHTS ORGANIZATION,<br>1500 Dixie Street<br>Charleston, WV 25311, | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| RESPONSIBLE DRILLING ALLIANCE,<br>P.O. Box 502<br>Williamsport, PA 17703, and | ) <br> ) <br> ) <br> ) |
| SAN JUAN CITIZENS ALLIANCE,<br>P.O. Box 2461<br>1309 East 3rd Ave., Suite 5<br>Durango, CO 81302, | ) <br> ) <br> ) <br> ) <br> ) |
| *Plaintiffs*, | ) <br> ) |

```
        v.                                    )
                                              )
GINA McCARTHY, in her official capacity as    )
Administrator, United States Environmental    )
Protection Agency,                            )
Office of the Administrator, Mail Code 1101A  )
1200 Pennsylvania Ave., N.W.                  )
Washington, DC 20460,                         )
                                              )
                Defendant.                    )
_____       )
```

## INTRODUCTION

1.       With this action, Plaintiffs Environmental Integrity Project, Natural Resources

Defense Council, Earthworks, Center for Health, Environment & Justice, West Virginia Citizen

Action Group d/b/a West Virginia Surface Owners' Rights Organization, Responsible Drilling

Alliance, and San Juan Citizens Alliance (Plaintiffs) seek to compel the U.S. Environmental

Protection Agency (EPA), through the Defendant EPA Administrator Gina McCarthy, to fulfill

long-delayed nondiscretionary duties and promulgate revised regulations and guidelines for the

disposal, storage, transportation, and handling of oil and gas wastes.

2.       Over the past decade, the oil and gas industry has grown exponentially and

expanded into new areas of the United States.  This growth is largely a result of the mainstream

use of horizontal drilling and hydraulic fracturing technologies and the application of these

technologies to unconventional oil and gas formations.  As a consequence of this rapid growth,

the industry now generates vast amounts and wide varieties of liquid and solid wastes during

exploration and production, including wastewater, drill cuttings, residual waste, and drilling

muds.  All of these wastes can contain harmful constituents ranging from heavy metals to

hydrocarbons to naturally occurring radioactive materials.  The industry disposes, stores,

transports, and otherwise handles these wastes through numerous facilities and processes,

including pits and impoundments, underground injection wells, landfills, water treatment facilities, and road- and land-spreading.

3.      Defendant has failed to meet continuing nondiscretionary duties under the Resource Conservation and Recovery Act (RCRA) to review and revise regulations and guidelines to keep up with this growing source of wastes and the threats these wastes pose to human health and the environment.

4.      First, Defendant has failed to meet the nondiscretionary duty under section 2002(b) of RCRA, 42 U.S.C. § 6912(b), to review and, if necessary, revise at least once every three years the Subtitle D criteria regulations, 40 C.F.R. Part 257, for wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal energy (oil and gas wastes).  EPA last conducted a review of the Subtitle D regulations for oil and gas wastes on July 6, 1988, when it determined that it was necessary to revise the general Subtitle D regulations to promulgate "tailored" regulations for oil and gas wastes.  To date, EPA has not completed these necessary revisions.

5.      Second, even if EPA had not determined in 1988 that revisions to the Subtitle D criteria regulations for oil and gas wastes were necessary, Defendant is under a nondiscretionary and continuing duty to review and, where necessary, revise the regulations "not less frequently than every three years."  42 U.S.C. § 6912(b).  EPA has not reviewed the Subtitle D criteria regulations for oil and gas wastes since July 6, 1988.  Since that time, nine successive three-year deadlines have passed with no further review.

6.      Third, Defendant has failed to meet the nondiscretionary duty under section 4002(b) of RCRA, 42 U.S.C. § 6942(b), to review the guidelines for state solid waste management plans "not less frequently than every three years, and revise[] as may be

appropriate." The last time EPA conducted a review and/or revision of the state plan guidelines was in 1981, when it revised the state plan guidelines to include additional public participation provisions. Since that time, eleven successive three-year deadlines have passed with no further review or revision of the guidelines.

7.      Congress mandated that Defendant regularly review and revise Subtitle D regulations and state plan guidelines to keep up with changes in industry practice and advances in understanding about public health and environmental risks related to waste management. Defendant has abdicated these nondiscretionary duties. In their current forms, the Subtitle D regulations and state plan guidelines are outdated, contain generic provisions that do not specifically address the modern oil and gas industry, and fail to adequately protect against potential harm to human health and the environment resulting from oil and gas wastes. Without strong Subtitle D rules and matching state plan guidelines tailored to the oil and gas industry, there is no federal floor to ensure that protective requirements for the control, monitoring, and disclosure of oil and gas wastes apply nationwide. Instead, there remains a state-by-state patchwork, where operators can "venue shop" for the least stringent requirements and community protections from human health and environmental impacts vary by state. Defendant must fulfill the nondiscretionary duties to review and revise the Subtitle D regulations and state plan guidelines for oil and gas wastes.

## JURISDICTION AND VENUE

8.      This action arises under RCRA's citizen suit provision. 42 U.S.C. § 6972(a)(2).

9.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 6972(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

10.     Venue is proper in this district under 42 U.S.C. § 6972(a).

11.     This Court may award Plaintiffs all necessary relief pursuant to 42 U.S.C.

§ 6972(a) and 28 U.S.C. §§ 2201-2202.

12.     Plaintiffs have provided Defendant with at least sixty days' written notice of the

violations of law alleged herein in the form and manner required by RCRA.  42 U.S.C.

§ 6972(c); 40 C.F.R. § 254.2(b).  A copy of Plaintiffs' notice letter is attached as Exhibit A to

this Complaint.

## PARTIES

<u>The Plaintiffs</u>

13.     Plaintiff Environmental Integrity Project (EIP) is a national nonprofit organization

existing and organized under the laws of the District of Columbia.  EIP is dedicated to

advocating for more effective enforcement of environmental laws.  EIP has three goals: (1) to

provide objective analyses of how the failure to enforce or implement environmental laws

increases pollution and affects public health; (2) to hold federal and state agencies, as well as

individual corporations, accountable for failing to enforce or comply with environmental laws;

and (3) to help local communities obtain the protection of environmental laws.

14.     Plaintiff Natural Resources Defense Council (NRDC) is a not-for-profit

environmental and public health organization with around 295,000 members. NRDC engages in

research, advocacy, media, and litigation related to protecting public health and the environment.

NRDC's mission includes the prevention and mitigation of air and water pollution, harm to fish

and wildlife, and health threats posed by toxic chemicals in order to protect and maintain NRDC

members' health and use and enjoyment of natural resources.  For years, NRDC has worked to

combat the harmful environmental and human health effects associated with the storage and

disposal of wastes from oil and gas exploration, development, and production.

15.     Plaintiff Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the impacts of irresponsible mineral and energy development while seeking sustainable solutions.  Earthworks fulfills its mission by working with communities and grassroots groups to reform government policies, improve corporate practices, influence investment decisions, and encourage responsible materials sourcing and consumption.

16.     Plaintiff Center for Health, Environment & Justice mentors a movement, empowering people to prevent harm to human health caused by exposure to environmental threats.  Through training, coalition building, and one-on-one technical and organizing assistance, the Center for Health, Environment & Justice works to level the playing field so that people can have a say in the environmental policies and decisions that affect their health and well-being.

17.     Plaintiff West Virginia Citizen Action Group, which sponsors and does business as West Virginia Surface Owners' Rights Organization (WVSORO), has 900 dues-paying members identified as WVSORO members, almost all of whom live or own land in West Virginia's oil and gas producing counties.  The organization serves as a resource for its members and for others on oil and gas related activities on their land and in their communities.  One resource, the WVSORO web site, averages over 300 daily visits at www.wvsoro.org.  The organization also advocates for surface owners' property rights and other rights to be recognized and respected by drillers and courts, and advocates for public policy and regulatory changes that will protect their land, air, and water.

18.     Plaintiff Responsible Drilling Alliance is a nonprofit membership organization based in Williamsport, Pennsylvania, that seeks to educate its members and the public about the

consequences of unconventional gas development, and advocates for the protection of natural resources and human health, safety, and quality of life in central Pennsylvania.  Responsible Drilling Alliance was formed by citizens in 2009 in response to the industrial transformation of the region, following the arrival of the unconventional gas extraction industry, and today its members include parents and grandparents, students, businesspeople, hunters, fishermen, farmers, hikers, teachers, truckers, those who have leased their land to a gas company, and those who refused.

19.     Founded in 1986, San Juan Citizens Alliance (SJCA) advocates for clean air, pure water, and healthy lands—the foundations of resilient communities, ecosystems, and economies in the San Juan Basin.  SJCA represents 700 dues-paying members and thousands of supporters who share SJCA's desire to ensure that economic development does not irrevocably harm the natural and cultural resources that we all depend on.

20.     Plaintiffs bring this action on behalf of themselves and their members.

21.     Plaintiffs and their members have been and continue to be adversely affected by Defendant's failure to review and revise the Subtitle D regulations and state plan guidelines within the three-year timeframes required by RCRA.

22.     Plaintiffs' members include individuals who live, work, or recreate near facilities that accept oil and gas wastes for storage and disposal, such as landfills, impoundments, and injection wells; sites where oil and gas waste disposal practices occur, such as road-spreading and land-spreading; and areas through which oil and gas wastes are transported, by truck, pipeline, and otherwise.  Without revised and updated RCRA Subtitle D regulations and state plan guidelines, this disposal, storage, transportation, and handling of oil and gas wastes occur

without proper safeguards and controls to prevent the release of harmful substances to the surrounding land, air, and water.

23.     Plaintiffs' members have encountered oil and gas wastes and their harmful constituents in the past and/or reasonably fear that they will encounter these wastes in the future through spills to surface water and land; contamination of soil, groundwater, and drinking water supplies; emission to the air; and other means of exposure.

24.     Without comprehensive and protective Subtitle D regulations and state plan guidelines, Plaintiffs' members reasonably fear that the underregulated disposal, storage, transportation, and handling of oil and gas wastes near where they live, work, or recreate will result in releases of wastes that threaten their health and the environment.

25.     Defendant's failure to review and make necessary revisions to the Subtitle D regulations and the state plan guidelines for oil and gas wastes as required by RCRA prolongs these exposures, risks, and reasonable fears.

26.     Plaintiffs' members have also used rivers, lakes, trails, forests, and other natural landscapes in the vicinity of facilities and sites where the disposal, storage, transportation, and handling of oil and gas wastes occur.  Plaintiffs' members have used these natural landscapes for recreation, personal enjoyment, scientific purposes, and other uses.  The threats of exposure posed by the disposal, storage, transportation, and handling of oil and gas wastes have diminished the benefit and enjoyment Plaintiffs' members derive from these natural landscapes and have made it less likely that Plaintiffs' members will continue to use and enjoy these landscapes in the future.  Defendants' failure to review and make necessary revisions to the Subtitle D regulations and the state plan guidelines for oil and gas wastes in a timely manner prolongs these harms.

27.     Defendants' failure to review and make necessary revisions to the Subtitle D regulations and the state plan guidelines for oil and gas wastes has also harmed Plaintiffs' abilities to fulfill and achieve their organizational objectives of protecting their members, their communities, the environment, and the public from the human health and environmental risks of oil and gas wastes.

28.     These injuries to Plaintiffs and Plaintiffs' members would be redressed by a declaratory judgment that Defendant's failure to review and make necessary revisions to the Subtitle D regulations and state plan guidelines for oil and gas wastes within the statutorily required timeline violates RCRA and by an order compelling Defendant to review and revise the Subtitle D regulations and state plan guidelines by a date certain.

The Defendant

30.     Defendant Gina McCarthy, Administrator of EPA, is the federal official responsible for EPA's administration of its legal authorities and duties, including the duties under RCRA to review and revise the Subtitle D regulations and state plan guidelines for oil and gas wastes within the prescribed three-year deadlines.

31.     Plaintiffs sue Administrator McCarthy in her official capacity.

**STATUTORY AND REGULATORY FRAMEWORK**

32.     Congress enacted RCRA in 1976 through amendments to the Solid Waste Disposal Act.  *See* Pub. L. No. 94-580, 90 Stat. 2795 (codified as amended at 42 U.S.C. §§ 6901-6992k).

33.     When enacting RCRA, Congress recognized that the generation of increasing amounts of solid waste and the problems of waste disposal had become matters "national in scope."  42 U.S.C. § 6901(a)(1)-(4).

34.     In particular, Congress recognized that "most solid waste is disposed of on land in open dumps and sanitary landfills"; that "the disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment"; and that "inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health."  42 U.S.C. § 6901(b)(1)-(3).

35.     For these reasons, Congress enacted RCRA "to promote the protection of health and the environment and to conserve valuable material and energy resources" by ensuring the safe handling, transportation, and disposal of solid waste.  42 U.S.C. § 6902.  To carry out these goals, RCRA provides for "the promulgation of guidelines for solid waste collection, transport, separation, recovery, and disposal practices and systems."  42 U.S.C. § 6902(a)(8).

36.     RCRA authorizes Defendant to "prescribe, in consultation with Federal, State, and regional authorities, such regulations as are necessary to carry out his functions" under the Act.  42 U.S.C. § 6912(a)(1).

37.     To ensure that these regulations remain up to date and adequate to fulfill RCRA's goals as the generation and constituents of wastes change over time, Congress charged Defendant with a continuing, nondiscretionary duty that "[e]ach regulation promulgated under this chapter shall be reviewed and, where necessary, revised *not less frequently than every three years*."  42 U.S.C. § 6912(b) (emphasis added).

38.     Congress also passed provisions concerning state solid waste plans to "assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound and which maximize the utilization of valuable resources including energy and materials

which are recoverable from solid waste and to encourage resource conservation."  42 U.S.C. § 6941.

39.     To fulfill these objectives, RCRA requires that Defendant "promulgate regulations containing guidelines to assist in the development and implementation of State solid waste management plans."  42 U.S.C. § 6942(b).

40.     RCRA also places on Defendant a continuing, nondiscretionary duty that these state plan guidelines "shall be reviewed from time to time, but *not less frequently than every three years*, and revised as may be appropriate."  *Id.* (emphasis added).

## FACTUAL BACKGROUND

The Oil and Gas Industry's Wastes and Disposal Practices

41.     The oil and gas industry generates a large amount and wide variety of liquid and solid wastes, including wastewater, drill cuttings, residual waste, and drilling muds.  The industry stores and disposes of these wastes in pits and impoundments, underground injection wells, landfills, and water treatment facilities; by road- and land-spreading; and through other practices and facilities.

42.     Oil and gas wastewater includes drilling wastewater, which is the water separated from recovered drilling fluids; hydraulic fracturing flowback, which is the water that returns to the surface upon completion of a well; and produced water, which is the water that returns to the surface from the well's downhole once production has begun.

43.     Wastewater can include chemical constituents added by well operators during drilling and hydraulic fracturing, as well as constituents naturally existing deep in the formation and brought to the surface.

46.     The exact composition of wastewater varies by chemical products used and characteristics of the formation.  In 2015, EPA collected and summarized a number of sources and studies that attempted to characterize the composition of wastewater from oil and gas operations on unconventional formations, such as shale.  EPA described the wastewater constituents in five categories: classical and conventional (e.g., total dissolved solids, total suspended solids, chlorides, sodium, and pH), organics (e.g., benzene, toluene, ethylbenzene, and xylene), metals (e.g., barium, strontium, and magnesium), radioactive constituents (e.g., radium-226 & -228), and other (e.g., guar gum and microorganisms).

47.     EPA's 2015 data on the concentrations of constituents of most concern for human health and the environment, such as organic compounds, demonstrates the potential hazards of exposure to oil and gas wastewater:

| Parameter | Range (µg/L) | Median (µg/L) |
|---|---|---|
| 1,2,4-trimethylbenzene | 0.54 - 4,000 | 5.0 |
| 1,3,5-trimethylbenzene | 0.64 - 1,900 | 5.0 |
| Acetone | 5.9 - 160,000 | 40 |
| Benzene | 0.99 - 800,000 | 8.5 |
| Carbon disulfide | 5.0 - 7,300 | 5.0 |
| Chlorobenzene | 0 - 500 | 5.0 |
| Chloroform | 0 - 500 | 5.0 |
| Ethanol | 1,000 - 230,000 | 10,000 |
| Ethylbenzene | 0.63 - 8,900 | 5.0 |
| Isopropylbenzene | 0.53 - 500 | 5.0 |
| Methanol | 3,200 - 4,500,000 | 10,000 |
| Methyl chloride | 2.0 - 500 | 5.0 |
| Naphthalene | 0.50 - 1,400 | 5.0 |

| Phenol | 0.70 - 460 | 2.0 |
| Pyridine | 1.1 - 2,600 | 86 |
| Tetrachloroethylene | 5.0 - 5,000 | 5.0 |
| Toluene | 0.91 - 1,700,000 | 6.0 |
| Xylenes | 3.0 - 440,000 | 15 |

48.     Recent research has demonstrated potential carcinogenic effects of hydraulic fracturing flowback water on human bronchial epithelial cells in correlation with long-term elevated levels of metals such as barium and strontium in the cells.

49.     In addition to these liquid wastes, oil and gas operations also generate a large amount of solid and semi-solid wastes with similarly wide ranges of toxic constituents.  These wastes fall primarily into four categories: drill cuttings, which are the pieces of formation cut away and returned to the surface during the drilling phase; drilling muds, which are used for a variety of purposes during drilling; residual waste, which is associated with waste treatment; and hydraulic fracturing sand (or frac sand), which is the fine silica used to "prop" open the fractures generated during hydraulic fracturing to allow the flow of gas to the surface.

50.     Drill cuttings are typically coated with the chemicals used in the drilling fluids and additionally contain chemicals that are already present in the formation, such as lead, arsenic, barium, chromium, uranium, radium, radon, and benzene.  Drill cuttings can also contain naturally occurring radioactive materials. An average well will bring hundreds of tons of cuttings to the surface, depending on the well's depth and the length and number of horizontal laterals.

51.     One of the most common ingredients in drilling muds is barite, which may contain toxic metals such as mercury, cadmium, and chromium.  A recent study of drilling muds in West Virginia found that "with the exception of arsenic, mercury, nitrate and selenium, the average concentrations of the primary and secondary drinking water parameters in drilling muds

were in excess of all of the inorganic drinking water standards," as well as drinking water standards for benzene and surfactants.

52.     Frac sand is fine silica sand treated with chemicals, such as polyacrylamide. Each well uses an average of 4.2 million pounds of frac sand, and the proportion of sand used has increased in recent years up to 20 percent of an average well's hydraulic fracturing fluids. In Pennsylvania, frac sand disposal increased 200 percent between 2011 and 2013, with most sent to landfills. Because operators inject frac sand along with hydraulic fracturing fluids, the sand returning to the surface is likely to contain hydraulic fracturing constituents.

53.     With respect to the disposal and storage of oil and gas wastes, one of the main practices of concern is the increasing use of open-air pits and impoundments. These pits and impoundments are used for the storage of oil and gas wastewater and solid wastes, as well as freshwater.

54.     Although the stated function of these pits and impoundments is typically for storage, their actual use and operation often constitutes "disposal," as defined by RCRA section 1004(3). 42 U.S.C. § 6903(3). The pits and impoundments experience evaporative loss of volatile chemicals to the air, frequent spills to land and surface water, and leaks to soil and groundwater. Additionally, operators commonly close out well sites by draining and burying the pits and impoundments—along with any settled solids they still contain, and sometimes even the used pit liners—on site.

55.     The number of pits and impoundments across the nation demonstrate the extent of this method of storage and disposal. For example, there are currently 13,379 oil and gas waste pits in Colorado, of which the state lists 3,183 as "active." Over half the pits in the state have no status listed at all. As of 2013, there were 529 pits and impoundments at oil and gas production

sites in Pennsylvania.  The average impoundment size has increased greatly in recent years.  An aerial survey conducted between 2010 and 2013 found that the average impoundment's area in Pennsylvania increased from 3,417 square meters to 7,553 square meters.

56.     With the expansion of oil and gas development and the increasing number of larger pits and impoundments serving multiple wells, environmental releases of waste from these sites have increased.  For example, a 2011 investigation found that faulty construction or maintenance of pits was the top cause of groundwater contamination connected to oil and gas development in Ohio, accounting for almost 44 percent of incidents.  A 2012 study commissioned by the West Virginia Department of Environmental Protection concluded that inadequate standards and oversight can result in the construction of larger pits and impoundments than allowed, resulting in safety and stability concerns.

57.     Another practice of concern is the use of underground injection wells for the disposal of oil and gas wastewater.  Nationwide, there are more than 170,000 "Class II" underground injection wells, which are permitted to allow injection of "fluids associated with oil and natural gas production" for enhanced oil and gas recovery and wastewater disposal.  In total, the nation's Class II wells accept at least two billion gallons of liquids from oil and gas production every day.  About twenty percent of these Class II wells are "Class IID" wells, which are used exclusively for the purpose of disposing of oil and gas wastewater.

58.     Injection wells are an increasingly popular means of disposal of oil and gas wastewater, particularly in the past decade.  Between 2011 and 2015, oil and gas wastewater injected underground in Ohio more than doubled.  One impact of this increased use of injection wells is the occurrence of earthquakes due to "induced seismicity."  Increased seismicity in the vicinity of injection wells has been documented in Alabama, Arkansas, Colorado, Kansas, New

Mexico, Ohio, Oklahoma, and Texas.  While certain states have taken some degree of action in response to these increasing earthquakes, others have not.

59.     Oil and gas wastewater is also disposed of through "road-spreading," a practice ostensibly used for the purposes of deicing and dust suppression.  This can result in runoff to waterbodies and increased human exposure to oil and gas constituents.  Several states, including New York, Pennsylvania, and Ohio, allow the road-spreading of oil and gas wastewater as a "beneficial use," with varying conditions.  In 2014 alone, the Pennsylvania Department of Environmental Protection allowed disposal of over 3 million gallons of untreated oil and gas wastewater by road-spreading in the northwestern part of the state.

60.     Over the past decade, sanitary landfills, including municipal facilities, have increasingly accepted drill cuttings and drilling muds for disposal.  These facilities are not equipped to handle certain constituents of oil and gas wastes, including naturally occurring radioactive materials.

61.     Transportation of oil and gas wastes by truck or pipeline has increased as a sector, with accompanying large-scale releases.  In July 2011, a wastewater pipeline leaked over 2 million gallons of wastewater, damaging twenty-four acres of private land in North Dakota.  The handling, storage, and disposal of oil and gas wastewater is a particularly large and growing issue for North Dakota; in 2013, operators produced 15 billion gallons of wastewater, and the spill rate is currently twice as high as it was in 2006.

62.     As these incidents and data demonstrate, the oil and gas boom has generated an increasing amount of wastes over the past decade, and comprehensive standards for proper disposal, storage, transportation, and handling are necessary to protect human health and the environment.

63.     There are no comprehensive federal regulations setting minimum standards for

the disposal, storage, transportation, and handling of oil and gas wastes. As a result, regulation of

oil and gas wastes is largely left to the states. The resulting state-by-state patchwork of

regulations incentivizes operators to send their wastes to states with the weakest regulations.

While the stringency of state regulations vary, EPA recently concluded that state oil and gas

waste programs "commonly lack[] certain regulatory parameters that are typically found in other

solid waste regulatory programs."

The Subtitle D Regulations for Oil and Gas Wastes

64.     Oil and gas wastes are currently exempt from regulation under RCRA Subtitle C's

hazardous waste provisions. Oil and gas wastes are subject only to RCRA Subtitle D's generic

provisions for the disposal, storage, transportation, and handling of solid waste.  While EPA

determined these generic provisions to be inadequate for oil and gas wastes and revision to be

necessary nearly three decades ago, it has taken no action to address this deficiency.

65.     In 1980, Congress passed the Solid Waste Disposal Act Amendments, which

amended RCRA in several ways.  Pub. L. No. 96-482, 94 Stat. 2334 (1980).  With respect to oil

and gas wastes, the "Bentsen Amendment," *id.* § 7, 94 Stat. at 2236-38, conditionally exempted

oil and gas wastes from regulation pursuant to RCRA Subtitle C's hazardous waste provisions.

42 U.S.C. § 6921(b)(2)(A).

66.     The Bentsen Amendment exempted the wastes until such time as EPA conducted

and transmitted a report to Congress considering "the human health and environmental effects of

oil and gas wastes, the adequacy of existing measures to prevent and mitigate these effects, and

the alternatives to such measures, along with their costs"; made a "Regulatory Determination"

following this report "either to promulgate regulations under the hazardous waste provisions of

Subtitle C for oil and gas wastes or that such regulations were unwarranted"; and transmitted this

Regulatory Determination to Congress.  42 U.S.C. §§ 6921(b)(2)(B)-(C), 6982(m).

67.     On July 6, 1988, EPA published its Regulatory Determination that oil and gas

wastes did not require regulation under Subtitle C of RCRA.  *See* 53 Fed. Reg. 25,446, 25,447-

48 (July 6, 1988).

68.     In support of this Determination, EPA considered three primary factors that it

drew from its Report to Congress: (1) "the adequacy of existing State and Federal regulatory

programs for controlling these wastes"; (2) "[t]he characteristics, management practices, and

impacts of [the] wastes on human health and the environment"; and (3) "the economic impacts of

any additional regulations on the exploration for, and development of" oil and gas.  *Id.* at 25,454.

69.     EPA gave great weight in particular to the adequacy of state and federal

regulatory programs.  *Id.*

70.     With respect to state programs, EPA found gaps in enforcement, gaps with respect

to certain types of wastes and disposal practices (such as associated wastes and storage pits), and

in some cases relaxation of state controls.  *Id.* at 25,447, 25,455.

71.     With respect to the federal regulatory program, EPA concluded that "[b]ecause

the [Subtitle D] programs' criteria are aimed principally at municipal solid waste, . . . they *do not*

*now fully address oil and gas waste concerns*."  *Id.* at 25,456 (emphasis added).  EPA also

determined that it possessed the "authority under Subtitle D to tailor requirements appropriate for

the disposal of oil and gas wastes."  *Id*.

72.     To rectify these issues, EPA proposed to implement a "three-pronged approach

toward filling the gaps in existing State and Federal programs that regulate the management of

wastes from the crude oil, and natural gas, industries."  *Id.* at 25,456.  This three-pronged

approach included: (1) working with the states to improve the strength and uniformity of their programs, (2) working with Congress to secure additional statutory authority, and (3) improving federal authorities under the Clean Water Act, the Safe Drinking Water Act's Underground Injection Control program, and RCRA's Subtitle D regulations for oil and gas wastes. *Id*. at 25,456.

73.     EPA laid out an extensive plan for how it would revise and "tailor" Subtitle D regulations at 40 C.F.R. Part 257 and provided examples of gaps it would address, including "associated wastes"—defined as "wastes other than produced water, drilling muds and cutting, and rigwash that are intrinsic to exploration, development and production of crude oil and natural gas"—and the management practices for storage and disposal of "large-volume wastes" (e.g., wastewater), such as road-spreading, land-spreading, and waste impoundments, 53 Fed. Reg. at 25,446 n.1, 25,457-58.

74.     Despite EPA's 1988 announcement that it would strengthen and tailor a program for the regulation of oil and gas wastes under Subtitle D, EPA appears to have taken no action to do so in the twenty-eight years since.

75.     Specifically, EPA has taken no action to seek comments, collect data, or propose changes to the Subtitle D criteria regulations at 40 C.F.R. Part 257 for oil and gas wastes, whether in the Federal Register or elsewhere.

76.     The only instance in which EPA subsequently addressed its Subtitle D regulations with respect to oil and gas wastes was when it "clarified" the scope of oil and gas wastes exempted from Subtitle C by the 1988 Regulatory Determination. *See* 58 Fed. Reg. 15,284 (March 22, 1993).

77.     Even though EPA found revision of the Subtitle D regulations for oil and gas wastes necessary to its Regulatory Determination, it did not accomplish their revision within the three-year deadline prescribed under 42 U.S.C. § 6912(b)—or even, as of today's date, within nine successive deadlines.

78.     EPA has not otherwise undertaken review of its Subtitle D regulations for oil and gas wastes since 1988.

The State Plan Guidelines for Oil and Gas Wastes

79.     As enacted in 1976, section 4002(b) of RCRA requires EPA to "promulgate regulations containing guidelines to assist in the development and implementation of State solid waste management plans."  42 U.S.C. § 6942(b).  These guidelines must include "methods for the disposal of waste which are environmentally sound," while also encouraging recycling and resource conservation.  42 U.S.C. § 6941.

80.     RCRA directs that state guidelines also reflect a number of other considerations, including: circumstances that may require different practices to "to insure the reasonable protection of the quality of the ground and surface waters from leachate contamination, the reasonable protection of the quality of the surface waters from surface runoff contamination, and the reasonable protection of ambient air quality"; "characteristics and conditions of collection, storage, processing, and disposal operating methods, techniques and practices"; "methods for closing or upgrading open dumps" to eliminate health hazards; and other considerations related to industry types, waste constituents, and surrounding geography and populations.  42 U.S.C. § 6942(c).

81.     EPA has referred to state solid waste management plans as the "centerpiece" of RCRA's Subtitle D program.  44 Fed. Reg. 45,066 (July 31, 1979).

82.     On July 31, 1979, EPA promulgated the original version of its guidelines for state

solid waste management plans.  *Id.* at 45,066.  These guidelines, however, largely delegated the

actual consideration of the eleven factors mandated by the statute to the states.

83.     For example, section 4002(c)(1) of RCRA provides that EPA's guidelines shall

consider "the varying regional, geologic, hydrologic, climatic, and other circumstances under

which different solid waste practices are required."  42 U.S.C. § 6942(c)(1).  Section 4002(c)(3)

requires EPA's guidelines to consider "methods for closing or upgrading open dumps for

purposes of eliminating health hazards."  42 U.S.C. § 6942(c)(3).

84.     EPA's 1979 guidelines under 40 C.F.R. Part 256 merely rephrase Congress's

language to recommend that state plans account for "climatic, geologic, and other relevant

characteristics of the State," and advise states to "take steps necessary to eliminate health hazards

and minimize potential health hazards."  40 C.F.R. §§ 256.22(a)(3), 256.23(d).

85.     In this way, EPA did not consider and apply the factors set out by Congress to

develop useful guidelines for the states, but rather merely restated those factors and delegated to

the states the responsibility of developing the actual guidelines.

86.     Congress expected EPA to incorporate these statutory factors into the

development of guidelines, and not simply restate them:

> In promulgating the minimum requirements *the Administrator* is required to
> consider regional, geographic, hydrologic conditions, the protection of the quality
> of ground and surface waters from leachate and runoff, the characteristics and
> conditions of collection, storage, processing and disposal, the location of
> facilities, and the nature of the materials to be disposed of.  *The Administrator's*
> *guidelines* should include methods of closing or upgrading open dumps . . . .

H.R. Rep. No. 94-1491, at 35, *reprinted in* 1976 U.S.C.C.A.N. 6238, 6273 (emphases added).

87.     To date, the only revision of the state plan guidelines occurred in 1981, when

EPA revised the state plan guidelines slightly to allow for expanded public participation in the

planning process and expedited approval of certain portions of state plans.  *See* 46 Fed. Reg. 47,048 (Sep. 23, 1981).

88.      Since 1981, eleven successive three-year deadlines have passed under 42 U.S.C. § 6942(b), without EPA having reviewed or revised the state plan guidelines.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C. § 6912(b)
### (Failure to Revise the Subtitle D Regulations for Oil and Gas Wastes)

89.      Plaintiffs reallege and incorporate by reference all the preceding paragraphs.

90.      Pursuant to section 2002(b) of RCRA, EPA has a nondiscretionary and continuing duty to ensure that "[e]ach regulation promulgated under this chapter shall be reviewed and, where necessary, revised not less frequently than every three years."  42 U.S.C. § 6912(b).

91.      EPA has failed to meet its nondiscretionary duty to review and, where necessary, revise the Subtitle D criteria regulations, 40 C.F.R. Part 257, with respect to oil and gas wastes.

92.      On July 6, 1988, EPA determined that revisions to the Subtitle D regulations were necessary, given that the generic existing Subtitle D regulations "do not now fully address oil and gas waste concerns."  EPA stated that it would use its "authority under Subtitle D to tailor requirements appropriate for the disposal of oil and gas wastes."

93.      Under the most generous reading of section 2002(b), EPA was required to have completed these necessary revisions by July 6, 1991.  Nearly twenty-eight years have passed since EPA's determination that revisions were necessary.

94.      This long-standing failure to make these necessary revisions to the Subtitle D regulations for oil and gas wastes violates section 2002(b) of RCRA and thereby constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."  42 U.S.C. §§ 6912(b), 6972(a)(2).

## SECOND CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C.  § 6912(b)
### (Failure to Review and, where Necessary, Revise the Subtitle D Regulations for Oil and Gas Wastes)

95.     Plaintiffs reallege and incorporate by reference all the preceding paragraphs.

96.     Even if EPA had not determined revision of the Subtitle D regulations for oil and gas wastes to be necessary on July 6, 1988, it is under a nondiscretionary and continuing duty to review and, where necessary, revise the regulations "not less frequently than every three years." 42 U.S.C. § 6912(b).

97.     EPA has not reviewed or revised the Subtitle D regulations for oil and gas wastes since July 6, 1988.

98.     This failure to review and, where necessary, revise the Subtitle D regulations for oil and gas wastes at least once every three years violates section 2002(b) of RCRA and constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."  42 U.S.C. §§ 6912(b), 6972(a)(2).

## THIRD CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C. § 6942(b)
### (Failure to Review the State Plan Guidelines for Oil and Gas Wastes and Revise as Appropriate)

99.     Plaintiffs reallege and incorporate by reference all the preceding paragraphs.

100.     Pursuant to section 4002(b) of RCRA, EPA has a nondiscretionary and continuing duty to review its guidelines for state solid waste management plans "not less frequently than every three years, and revise[] as may be appropriate."  42 U.S.C. § 6942(b).

101.     EPA last conducted a review or revision of the state plan guidelines for oil and gas wastes on September 23, 1981.

102.     Since that time, eleven successive three-year deadlines have passed with no further review or revision of the state plan guidelines.

103.     This failure to review or revise the state plan guidelines for oil and gas wastes violates section 4002(b) of RCRA and thereby constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 42 U.S.C. §§ 6942(b), 6972(a)(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment as follows:

A.     Declare that Defendant has violated RCRA by repeatedly failing to meet the statutory deadlines for completing the requisite review and revision of the Subtitle D regulations for oil and gas wastes and the state plan guidelines for oil and gas wastes;

B.     Order Defendant to issue necessary revisions of the Subtitle D regulations for oil and gas wastes in accordance with section 2002(b) of RCRA by a date certain;

C.     In the alternative, order Defendant to review and, where necessary, revise the Subtitle D regulations for oil and gas wastes in accordance with section 2002(b) of RCRA by a date certain;

D.     Order Defendant to review and, as appropriate, revise the state plan guidelines for oil and gas wastes in accordance with section 4002(b) of RCRA by a date certain;

E.     Retain jurisdiction of this matter until Defendant has fulfilled all legal and Court-ordered obligations;

F.     Award Plaintiffs reasonable fees, expenses, and costs, including attorneys' fees associated with this litigation; and

G.     Grant Plaintiffs such further relief as the Court may deem just and proper.

Respectfully submitted this 4th day of May, 2016.

/s/ Adam Kron
ADAM KRON (D.C. Bar No. 992135)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
(202) 263-4451
(202) 296-8822 (fax)
akron@environmentalintegrity.org

JARED KNICLEY (D.C. Bar No. 1027257)
Natural Resources Defense Council
1152 15th St, NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

*Attorneys for Plaintiffs*