## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ENVIRONMENTAL INTEGRITY
PROJECT, et al.,

      Plaintiffs,

          v.

GINA MCCARTHY,

      Defendant.

Civil Action No. 16-842 (JDB)

## MEMORANDUM OPINION

Plaintiffs, a coalition of environmental advocacy groups,[1] are unimpressed by the EPA's current regulations and guidelines concerning the disposal, storage, transportation, and handling of oil and gas wastes. On the other hand, movants—the State of North Dakota, the American Petroleum Institute, the Independent Petroleum Association of America, and the Texas Independent Producers and Royalty Owners Association[2]—think the EPA's current approach is just fine. But this case is not about that dispute. Instead, this case deals with a different and narrower question: whether the EPA Administrator has violated non-discretionary, statutory duties to periodically review and, where necessary, revise those regulations and guidelines. Plaintiffs allege that the Administrator has violated those duties, and thus asks the Court to order the Administrator to perform them by a certain date. Fearing that such an order would result in burdensome new regulations, movants seek to intervene in this litigation pursuant to Federal Rule

---

[1] Plaintiffs are the Environmental Integrity Project; the Natural Resources Defense Council; Earthworks; the Center for Health, Environment and Justice; the West Virginia Citizen Action Group; the Responsible Drilling Alliance; and the San Juan Citizens Alliance.

[2] The American Petroleum Institute and the Independent Petroleum Association of America sought intervention through the same motion. They will be referred to collectively as the Industry Associations.

of Civil Procedure 24. Under this Circuit's standing jurisprudence, however, they are not entitled to intervene as of right. Nor would their participation be helpful in resolving the issues raised in this case. As a result, the motions to intervene will be denied.

## BACKGROUND

The Resource Conservation and Recovery Act of 1976, Pub. L. 94-580, 90 Stat. 2795 (1976), created a comprehensive program for the handling of solid wastes. Hazardous wastes are governed by Subtitle C of the Act, see 42 U.S.C. §§ 6921–39g, which "establishes a cradle to grave federal regulatory system for [their] treatment, storage, and disposal." Am. Portland Cement Alliance v. EPA, 101 F.3d 772, 774 (D.C. Cir. 1996) (internal quotation marks omitted). Non-hazardous solid wastes, on the other hand, are addressed by Subtitle D of the Act. See id. §§ 6941–49a. "Under Subtitle D, states use federal financial and technical assistance to develop solid waste management plans in accordance with federal guidelines." Envtl. Def. Fund v. EPA, 852 F.2d 1309, 1310 (D.C. Cir. 1988).

Oil and gas wastes are currently governed by Subtitle D. In 1980, Congress exempted oil and gas wastes from regulation under Subtitle C—although if the EPA later determined that Subtitle C regulations were warranted, the agency was permitted to propose such regulations to Congress for possible adoption. Am. Iron & Steel Inst. v. EPA, 886 F.2d 390, 394 (D.C. Cir. 1989) (citing 42 U.S.C. § 6921(b)(2)(A) (the "Bentsen amendment")). In a subsequent regulatory determination, the EPA concluded that oil and gas wastes should be treated only as non-hazardous wastes subject to Subtitle D. See Regulatory Determination for Oil and Gas and Geothermal Exploration, Development and Production Wastes, 53 Fed. Reg. 25,446, 25,446 (Jul. 6, 1988); see also Am. Iron & Steel Inst., 886 F.2d at 394.

This case concerns two sets of regulations promulgated by the EPA under Subtitle D. The first set establishes federal criteria for the classification of solid waste disposal facilities and practices. See 40 C.F.R. pt. 257; see also 42 U.S.C. § 6944(a). Facilities that fail to satisfy these criteria are classified as "open dumps"; practices that fail to satisfy the criteria are classified as "open dumping." See 40 C.F.R. § 257.1(a)(1)–(2). Both open dumps and open dumping are prohibited by the Act. Id.; see also 42 U.S.C. § 6945(a). The second relevant set of regulations establishes guidelines to assist states with the development and implementation of state solid waste management plans. See 40 C.F.R. pt. 256; see also 42 U.S.C. § 6942(a).

Plaintiffs believe that these regulations have failed to keep pace with recent developments in the oil and gas industry, like the advent of hydraulic fracking. See Compl. [ECF No. 1] ¶¶ 2–3. They lay the blame for that failure at the feet of the Administrator who, they allege, has not meaningfully reviewed or revised the Subtitle D classification criteria since 1988, id. ¶ 4, or the state plan guidelines since 1981, id. ¶ 6. This suit is an attempt to spur some administrative action. Plaintiffs invoke the Act's citizen suit provision, which allows individuals to sue the Administrator where she has allegedly failed "to perform any act or duty under this chapter which is not discretionary." 42 U.S.C. § 6972(a)(2). Plaintiffs allege breaches of two non-discretionary duties here. First, they claim the Administrator was required to review and, where necessary, revise the Subtitle D classification criteria not less frequently than every three years. Compl. ¶ 4 (citing 42 U.S.C. § 6912(b)). Second, they claim the Administrator was required to review the state guidelines not less frequently than every three years, and revise them as may be appropriate. Id. ¶ 6 (citing 42 U.S.C. § 6942(b)).

Asking the Court to enforce these statutory provisions, plaintiffs' complaint includes three claims for relief. The first alleges that the Administrator already determined, in 1988, that

revisions to the Subtitle D classification criteria were "necessary," see Compl. ¶ 92, and thus asks the Court to order the Administrator to "issue necessary revisions" of those regulations "by a date certain," id. (prayer for relief B). In the alternative, plaintiffs' second claim asks the Court to order the Administrator to "review, and where necessary revise" the Subtitle D classification criteria for oil and gas wastes "by a date certain." Id. (prayer for relief C). And the third claim seeks similar relief as to the state plan guidelines. Id. (prayer for relief D).

Now pending before the Court are three motions to intervene, filed by four would-be intervenors. Each claims that it has important interests at stake in this litigation. North Dakota, which is home to a thriving oil and gas industry, is concerned that, inter alia, it would "bear the additional cost of implementing any new federal regulations" resulting from this action. See North Dakota's Mot. to Intervene [ECF No. 11-2] at 2. The Industry Associations are likewise concerned about "the imposition of unnecessary and unduly burdensome" new regulations, see Industry Ass'ns.' Mot. to Intervene [ECF No. 14] at 3, as is the Texas Independent Producers and Royalty Owners Association (TIPRO), see TIPRO's Mot. to Intervene [ECF No. 20-1] at 1. Each believes that Rule 24(a) of the Federal Rules of Civil Procedure entitles it to intervene in this action as a matter of right. In the alternative, however, each also seeks permissive intervention under Rule 24(b). The plaintiffs and the EPA oppose intervention.

## LEGAL STANDARD

When determining whether a movant may intervene as of right under Rule 24(a), a court must consider four factors:

> (1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties.

<u>Fund for Animals, Inc. v. Norton</u>, 322 F.3d 728, 731 (D.C. Cir. 2003) (internal quotation marks omitted).   Under circuit precedent, however, a would-be intervenor must also demonstrate that it has Article III standing.   <u>Id.</u> at 731–32.   Movants who lack standing are ineligible to intervene as of right.   <u>In re Endangered Species Act Section 4 Deadline Litig. – MDL No. 2165</u>, 704 F.3d 972, 979 (D.C. Cir. 2013).

The "irreducible constitutional minimum of standing" consists of three elements: (1) movants must demonstrate an injury in fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that a favorable decision on the merits will redress the injury.   <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–61 (1992).   An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."   <u>Id.</u> at 560 (internal quotation marks and citations omitted).

Alternatively, movants seek permissive intervention under Rule 24(b), which affords the district court discretion to permit intervention by movants who have a "claim or defense" that shares a "common question of law or fact" with the main action.   Fed. R. Civ. P. 24(b)(1).   "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."   Fed. R. Civ. P. 24(b)(3).   It may also consider "whether [the] parties seeking intervention will significantly contribute to the just and equitable adjudication of the legal question presented."   <u>Sierra Club v. McCarthy</u>, 308 F.R.D. 9, 12 (D.D.C. 2015) (internal quotation marks and alterations omitted).   The D.C. Circuit has not decided whether Article III standing is required for permissive intervention.   <u>Id.</u> at 13 n.2 (citing <u>Defenders of Wildlife v. Perciasepe</u>, 714 F.3d 1317, 1327 (D.C. Cir. 2013)).

## DISCUSSION

### A.  Intervention as of Right

Whether movants can intervene in this action as of right boils down to a dispute about whether they have Article III standing.  Several recent cases from this circuit have addressed standing in circumstances similar to those presented here.  In Defenders of Wildlife v. Perciasepe, for example, plaintiffs sued the EPA Administrator alleging that he had failed to perform a non-discretionary duty to issue regulations under the Clean Water Act; along with the complaint, the parties proposed a consent decree requiring the EPA to issue a notice of proposed rulemaking and, following a specified period of notice-and-comment, to take final action. 714 F.3d at 1321.  When an association of energy companies sought to intervene, the district court denied the motion on the basis that the movant lacked standing.  Id. at 1322.  The D.C. Circuit affirmed.  The consent decree, the court explained, did not "require EPA to promulgate a new, stricter rule.  Instead, it merely require[d] that EPA conduct a rulemaking and then decide whether to promulgate a new rule—the content of which [was] not in any way dictated by the consent decree—using a specific timeline." Id. at 1324.  The movant feared that judicial approval of the consent decree might, in time, lead to the promulgation of adverse regulations.  But "the possibility of potentially adverse regulation" was insufficient to confer Article III standing.  Id. at 1325.

Applying Defenders of Wildlife, the D.C. Circuit arrived at a similar result in In re Idaho Conservation League, 811 F.3d 502 (D.C. Cir. 2016).  There, a number of environmental groups alleged that the EPA had failed to promulgate regulations required by a different environmental statute.  Id. at 506.  Petitioners and the agency ultimately proposed a consent decree, which would establish "an agreed upon schedule for a rulemaking" for one industry and "a timetable" by which the EPA would determine whether to engage in rulemaking for three other industries.  Id. at 507.  Once again, industry groups attempted to intervene, asserting that promulgation of stricter, more

burdensome regulations was a "foregone conclusion." Id. at 514. Once again, however, the D.C. Circuit held that movants lacked standing. Pursuant to the consent decree, the court reasoned, the EPA "retain[ed] 'discretion to promulgate a rule or decline to do so,'" even for the industry in which initiation of a rulemaking was required. Id. (quoting Defenders of Wildlife, 714 F.3d at 1325 n.7). Thus, rather than "resolv[ing] the substance of any rulemaking," the consent decree merely "'prescrib[ed] a date by which regulation could occur.'" Id. (quoting Defenders of Wildlife, 714 F.3d at 1325). Because the consent decree did not itself inflict concrete harm on movants' interests, they lacked standing.

United in their opposition to the motions to intervene, plaintiffs and the EPA argue that this case fits squarely within that precedent. At most, they contend, this action will result in an order setting a "date certain" by which the EPA must make decisions about its Subtitle D classification criteria and state plan guidelines. The substantive content of those decisions, however, will not be dictated by this litigation and will therefore remain within the discretion of the agency. See Def.'s Opp'n [ECF No. 25] at 1–2; Pls.' Opp'n [ECF No. 24] at 1–2. Hence, the parties continue, this action is merely about the timing of the EPA's determination. And suits "over the timing of an agency determination [have] no effect on the movant's interest in the substance of the determination." Sierra Club, 308 F.R.D. at 12 (citing Defenders of Wildlife, 714 F.3d at 1317). Put this all together here, the parties conclude, and movants, who are concerned primarily about the costs that they may incur under any revised regulatory regime, lack standing in this case focused only on scheduling of rulemaking review and therefore are not entitled to intervene as of right. See Def.'s Opp'n at 1–2; Pls.' Opp'n at 1–2. The Court agrees.

Movants spend numerous pages trying to muddy the waters. First, they resist the parties' attempt to characterize this action as one merely about scheduling. That characterization, they

argue, is belied by plaintiffs' first claim for relief, which seeks an order requiring the Administrator to "issue necessary revisions" of the Subtitle D classification criteria by a date certain. See Compl. (prayer for relief B). In movants' view, plaintiffs seek a judicial order declaring that the current classification criteria are inadequate and requiring the promulgation of stricter ones—all to movants' inevitable detriment. See North Dakota's Reply [ECF No. 27] at 7–8; Industry Ass'ns.' Reply [ECF No. 26] at 15–17; TIPRO's Reply [ECF No. 28] at 6–7. By requesting such relief, movants contend, plaintiffs seek to put the substance of the EPA's regulations squarely before the Court, to limit the EPA's discretion, and to obtain a court order broader than those in prior cases. Thus, movants assert that Defenders of Wildlife and In re Idaho Conservation League are distinguishable, and that this Court's analysis should be guided by an older D.C. Circuit case, Natural Resource Defense Council v. Costle, 561 F.2d 904 (D.C. Cir. 1977), in which intervention was allowed. See Industry Ass'ns.' Reply at 13–15; TIPRO's Reply at 16–17.

These arguments are unpersuasive. Plaintiffs, as the masters of their complaint, deny that they are seeking this expansive relief. According to plaintiffs, their first claim for relief seeks only an order "requiring EPA to conduct [a] rulemaking on a date certain schedule." Pls.' Opp'n at 4 (internal quotation marks omitted). "[A]t most," that order would "set a schedule for EPA to issue a proposed rule and take final action on the proposed rule." Id. at 10–11. It would not in any way dictate the rule's content, nor prevent the EPA from declining to promulgate a new rule at all. Id. (citing In re Idaho Conservation League, 811 F.3d at 514). Even as to its (allegedly broadest) first claim for relief, therefore, plaintiffs consider the "substance of any revised federal regulations" to be "beyond the scope of this action." Id. at 17.

The Court accepts plaintiffs' representations about the scope of their complaint.[3]  Based on those representations, their request for an order requiring EPA to "issue necessary revisions" is properly construed as a request for an order requiring the EPA to initiate a rulemaking and to issue whatever regulations that it, in its discretion, deems necessary—the same relief provided by the consent orders in the cases that movants now seek to distinguish.  See Defenders of Wildlife, 714 F.3d at 1324–25; In re Idaho Conservation League, 811 F.3d at 514.  Nor is the Court comfortable relying on Costle, which did not perform the standing inquiry required by more recent D.C. Circuit precedent.  See Defenders of Wildlife, 714 F.3d at 1325 (Costle "has no precedential effect on the jurisdictional question before us."); see also Sierra Club, 308 F.R.D. at 13 (refusing to follow Costle on similar grounds).  The Industry Associations contend that Costle can nonetheless guide the analysis here because the Costle court conducted a standing-like inquiry under Rule 24(a) by assessing whether intervenors had a legally protected interest in the litigation.  See Industry Ass'ns.' Reply at 13.  The D.C. Circuit thinks otherwise.  See Defenders of Wildlife, 714 F.3d at 1325 n.8 ("There is no argument that Costle indirectly addressed standing by analyzing Rule 24(a)(2).").  Thus far, then, movants have failed to convince the Court that this is more than a case about scheduling, and hence controlled by Defenders of Wildlife and its progeny.

The Industry Associations and TIPRO put forth two related arguments that also fail.  The Industry Associations raise the possibility that, in the event plaintiffs prevail, the Court will award them relief beyond what they have requested.  See Industry Ass'ns.' Reply at 6 ("[N]o one yet knows what breadth this Court's order might be.").  That is pure speculation—and no more likely

---

[3] The Administrator reads plaintiffs' complaint in the same manner.  See Def.'s Opp'n at 10–11 ("To be clear, the content of EPA's decisions under RCRA is not within the scope of relief requested in the Complaint—nor, indeed, could it be . . . . Even if Environmental Plaintiffs were to prevail on Count One of their Complaint, which alleges that EPA decided in 1988 that revised [classification criteria] were necessary, the maximum relief that Environmental Plaintiffs request is that the Court order EPA to make the necessary revisions—whatever they may be—by a date certain.").

in this case than in any other where the ultimate disposition is unknown. Standing cannot rest on such speculative fears. The Industry Associations and TIPRO also argue that they have standing as the "object of the action" at issue. See Industry Ass'ns.' Mot. to Intervene at 27; TIPRO's Reply at 16. In a challenge to a rulemaking, for example, the regulated entities are the objects of the challenged agency action, and are therefore quite likely to have standing. See Fund for Animals, 322 F.3d at 733–34. Here, however, the challenged agency (in)action is that of the Administrator, and an order granting plaintiffs relief would simply bind her to undertake procedural steps, causing no injury-in-fact to movants. Indeed, movants do not claim to have been harmed by the Administrator's alleged inaction at all—if anything, they have benefitted from it. See Weaver's Cove Energy, LLC v. Rhode Island Dep't of Envtl. Mgmt., 524 F.3d 1330, 1333 (D.C. Cir. 2008).

Undeterred, movants seek a second way around Defenders of Wildlife. Unlike that case, they argue, this case does not involve a proposed consent decree. If the EPA continues to litigate this case, it will raise a number of substantive legal issues—issues on which movants have an interest in being heard. Collectively, the motions to intervene identify a laundry list of these issues. See, e.g., Industry Ass'ns.' Mot. to Intervene at 6 ("With respect to the First Claim for Relief . . . the court must resolve the following [eleven] issues, in each of which movants can articulate compelling interests . . . ."); id. at 16 ("[Movants] have an interest in ensuring that the statutory framework of RCRA is not subverted . . . ."); id. ("[Movants] have a protectable interest in the construction of the statute that regulates them and their members' operations."); TIPRO's Mot. to Intervene at 11–12 ("TIPRO has a distinct and direct interest in protecting the integrity of both the federal-state framework and the Texas RCRA program."); id. at 17 ("TIPRO has an interest in setting the record straight as to the many factors that control determinations about disposal of such

wastes."); TIPRO's Reply at 16 (TIPRO members have an "interest in how key statutory provisions important to their business interests are interpreted.").

But these "interests," as movants describe them, are insufficient to confer Article III standing.  Even if the issues that movants identify are raised in this litigation, and even if they are resolved "against" movants in some sense, the most that will result is an order requiring some agency action by a "date certain," and the "possibility of potentially adverse regulation" at some point in the future.  Defenders of Wildlife, 714 F.3d at 1324.  These speculative consequences do not rise to the level of an injury-in-fact.  Id.  Untethered, then, to any actual and imminent injury threatened by this case, movants' professed desire to weigh in on its merits is more akin to a "generally available grievance about government," which is insufficient to create an Article III controversy.  See Lujan, 504 U.S. at 573–74.  Movants do not have standing to participate in this case merely because it relates to their policy goals or because it may create precedent contrary to their preferred interpretation of the law.  See Crossroads Grassroots Policy Strategies v. FEC, 788 F.3d 312, 316 (D.C. Cir. 2015) ("[W]here a party tries to intervene as another defendant, we have required it to demonstrate Article III standing, reasoning that otherwise any organization or individual with only a philosophic identification with a defendant—or a concern with a possible unfavorable precedent—could attempt to intervene and influence the course of litigation." (internal quotation marks omitted)); Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995) ("[S]howing [Article III standing] requires more than allegations of damage to an interest in seeing the law obeyed or a social goal furthered." (internal quotation marks omitted)).

Finally, movants attempt to avoid Defenders of Wildlife by (somewhat vaguely) invoking the doctrine concerning "procedural injuries."  The procedural injuries doctrine "'loosens the strictures' of the standing injury by relaxing the immediacy and redressability requirements."  In

re Endangered Species Act Section 4 Deadline Litig., 704 F.3d at 976–77 (alteration omitted) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009)).  But to successfully invoke that doctrine, an individual must still point to a procedural right "'designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'"  Id. at 977 (quoting Lujan, 504 U.S. at 573 n.8).

Movants' claims of procedural injuries focus once again on plaintiffs' first claim for relief. Ordinarily, movants argue, they would be entitled to participate in a review of the Subtitle D classification criteria, before the EPA decided whether any revisions were necessary.  But if plaintiffs succeed in obtaining a court order that directs the EPA to initiate a rulemaking, movants will be locked out of this consultative process and their input will be confined to a (probably rushed, in their view) period of notice and comment. All of this, they conclude, violates procedural rights designed to protect their concrete interests. See, e.g., North Dakota's Mot. to Intervene at 4–5 ("Plaintiffs' requested relief would also effectively foreclose North Dakota's right to argue in the review process that the current federal regulations and guidelines are serving their purpose of providing support to its very effective solid waste program and that revising them would be counterproductive or unnecessary."); Industry Ass'ns.' Mot. to Intervene at 18–19 ("[Industry Associations] have a direct interest in any timetable that is established for review and revision," in part because an "[a]ccelerated review of any potential regulations would necessarily diminish the opportunity for [them] to convey sufficiently the industry knowledge [they] have acquired over the years."); TIPRO's Reply at 10 ("Although Plaintiffs and EPA would have the chance to participate in and comment on the rulemaking that would actually establish standards, TIPRO's ability to participate in the preliminary determination whether such a rulemaking is even necessary would be foreclosed.").

These arguments do not amount to a procedural injury for purposes of Article III. First, as EPA points out, movants have not cited any persuasive authority for the proposition that they are entitled to participate when the EPA reviews its regulations to determine whether revisions may be necessary. See Def.'s Opp'n at 15 n.2; see also id. at 23. In an attempt to do so, TIPRO vaguely invokes "the protocols required by RCRA, the [Administrative Procedure Act], and the Due Process provisions of the U.S. Constitution." TIPRO's Reply at 13. That will not suffice.[4] Without more, movants have failed to identify a "statutory procedure" that plaintiffs' requested relief, if granted, would "require[] EPA to violate." Defenders of Wildlife, 714 F.3d at 1324. Nor do they make any headway by speculating that this case may result in a notice-and-comment rulemaking conducted on a compressed schedule. Similar arguments have recently been rejected by the D.C. Circuit, and thus will be here as well. See In re Idaho Conservation League, 811 F.3d at 514; Defenders of Wildlife, 714 F.3d at 1324. Hence, movants have failed to identify a procedural injury that will support their standing.[5]

Out of ways to avoid Defenders of Wildlife, movants barrel headlong into it. The remaining "injuries" they allege would be inflicted only if the EPA actually promulgates new and stricter regulations. North Dakota, for example, claims that an EPA decision to regulate oil and gas wastes as "hazardous" under Subtitle C would cost the state and its oil and gas industry tens

---

[4] TIPRO's reply also cites 5 U.S.C. § 553(b) and (c), which govern notice-and-comment rulemaking. These provisions do not create a right for members of the public to participate in an agency's deliberations about whether to propose a rulemaking. See Nat'l Mining Ass'n v. Mine Safety & Health Admin., 599 F.3d 662, 671 (D.C. Cir. 2010) (agency was not required to comply with notice-and-comment procedures before "withdrawing its intent" to propose a rulemaking).

[5] The Industry Associations believe they have a "procedural right" in the Bentsen Amendment, which exempted oil and gas wastes from regulation as hazardous wastes under Subtitle C pending further action by Congress or the EPA. See 42 U.S.C. § 6921(b)(2)(A); Am. Iron & Steel Inst., 886 F.2d at 377. The Industry Associations imply that the relief sought by plaintiffs in this case would violate the Bentsen amendment, and thereby threaten their concrete interests. See Industry Ass'ns.' Reply at 9. The Court does not understand how the EPA would violate the Bentsen amendment simply by scheduling a rulemaking or by reviewing its regulations—the only relief sought by plaintiffs in this case.

of millions of dollars. See Decl. of Lynn Helms [ECF No. 11-3] ¶ 25; see also Decl. of David Glatt [ECF No. 11-4] ¶ 11. The state is also concerned that new regulations would threaten its thriving oil and gas industry, depress its tax intake, and interfere with its sovereign right to regulate within its own borders. See North Dakota's Mot. to Intervene at 16–19. The Industry Associations are similarly concerned about what new regulations might mean for their members, who believe that overly stringent regulation of oil and gas wastes would require operators to spend significant funds reconfiguring capital, increase the costs of regulatory compliance, and, ultimately, drive up the price of oil and gas products—all without environmental benefit. See Aff. of Erik Milito [ECF No. 14-1] ¶ 8; Aff. of Lee O. Fuller [ECF No. 14-2] ¶¶ 8–10; Aff. of Douglas Gonzalez [ECF No. 14-3] ¶¶ 8–9; see also Industry Ass'ns.' Mot. to Intervene at 24–25. TIPRO members also join the chorus, echoing several of the same concerns. See Aff. of Ed Longanecker [ECF No. 20-2] ¶ 8; Aff. of Raymond Welder [ECF No. 20-3] ¶¶ 5–7; see also TIPRO's Mot. to Intervene at 11–13.

All of this is contingent, however, on EPA deciding to issue new and stricter regulations. Movants may feel that stricter regulation is a "foregone conclusion." See In re Idaho Conservation League, 811 F.3d at 514. But this case does not concern the substantive content of EPA's regulations. That issue will be taken up, if at all, in a notice-and-comment rulemaking conducted by EPA at some point in the future. But for the time being all that exists is the "possibility of potentially adverse regulation," which does not rise to the level of a concrete and imminent injury-in-fact for purposes of Article III.[6] See Defenders of Wildlife, 714 F.3d at 1324–25. Because

___

[6] North Dakota also cites the Supreme Court's decision in Massachusetts v. EPA, 549 U.S. 497, 520 (2007), as support for the proposition that it deserves "special solicitude in the standing analysis." North Dakota's Mot. to Intervene at 22. But Massachusetts does not obviate North Dakota's need to point to an injury-in-fact, traceable to the challenged action, and redressable by the judicial relief requested. See Massachusetts, 549 U.S. at 521–27. There, the state asserted that "rising seas had begun to swallow [its] coastal land." Id. at 521. Here, North Dakota has not alleged an analogous injury-in-fact to the "earth and air within its domain." Id. at 519 (quoting Georgia v. Tennessee Copper Co., 206 U.S. 230, 237 (1907)). The injuries it has alleged will only come to pass if the EPA adopts stricter federal regulations—a contingency outside the control of this Court and insufficient to support North Dakota's standing.

movants lack standing, they are not entitled to intervene in this action as of right under Rule 24(a).[7]
See In re Idaho Conservation League, 811 F.3d at 513–14 ("[P]roposed intervenors fall short of
demonstrating their right to intervene because they fail to show they have Article III standing,
which they do not dispute is required.").

### B. Permissive Intervention

The remaining question is whether movants should be permitted to intervene under Rule
24(b). Under D.C. Circuit precedent, it is unclear whether movants' inability to demonstrate
Article III standing must also doom their request for permissive intervention. See Defenders of
Wildlife, 714 F.3d at 1327. The Court need not reach that question, however, because it will deny
movants' request for permissive intervention on other grounds.

In support of their motions, movants highlight their substantive experience with
implementation of solid waste disposal programs, particularly as they relate to oil and gas wastes.
See North Dakota's Mot. to Intervene at 26 ("North Dakota will certainly contribute to a full
development of the factual and legal issues in this case because it has been implementing a solid
waste program under RCRA Subtitle D with a particular emphasis on the oil and gas sector for
more than thirty years."); Industry Ass'ns.' Mot. to Intervene at 29 ("[O]n the basis of their
experience on the substantive issues implicated in this action as demonstrated by the decades of
involvement in the oil and gas industry, [the Industry Associations] can be expected to aid the
Court and the parties in resolving the issues in this case and fashioning appropriate relief, if

---

[7] Several movants suggest that, if they lack standing, then plaintiffs must lack standing as well. See North
Dakota's Reply at 10–14; Industry Ass'ns.' Reply at 18–20. But Article III does not require such complete symmetry.
The D.C. Circuit's decision in In re Idaho Conservation League provides a case in point. In that case, petitioners
claimed that their injuries would be redressed by stricter federal regulation. 811 F.3d at 509–10. Proposed intervenors,
on the other hand, claimed that they would be injured by the adoption of the same regulations. Id. at 513–14. The
court held that the petitioners had standing while the proposed-intervenors lacked it, even though the decision about
whether to promulgate the regulations remained in the discretion of the EPA. See id. at 509–14.

necessary."); TIPRO's Mot. to Intervene at 25 ("TIPRO will assure that all interested parties are heard regarding the lawfulness of EPA's activity with respect to the regulation of oil and gas wastes under RCRA, the adequacy of existing state regulations, the impact of potential federal regulation on both states and regulated entities, and other important issues at stake in this case.").

But as explained above, this case is not about the substantive content of federal regulation.[8] Although movants' plainly have much to say on that topic, the Court does not think their input will be particularly helpful in achieving the just resolution of the narrower procedural question posed here. See Ctr. for Biological Diversity v. EPA, 274 F.R.D. 305, 313 (D.D.C. 2011). Movants' desire to inject their substantive concerns into this procedural case, moreover, threatens to delay resolution of the claims pending between the original parties. See Sierra Club, 308 F.R.D. at 13. Even assuming, therefore, that movants' have a "claim or defense" in common with the original action, as a matter of this Court's discretion, their motions for permissive intervention will be denied.

## CONCLUSION

For the foregoing reasons, movants' motions to intervene will be denied. A separate Order has issued on this date.

/s/

JOHN D. BATES
United States District Judge

Dated: November 18, 2016

---

[8] North Dakota also invokes Rule 24(b)(2), which allows for permissive intervention by state officers or agencies where "a party's claim or defense is based on" a statute, executive order, or regulation administered by that officer or agency. See North Dakota's Mot. to Intervene at 26. Trying to squeeze into that rule's ambit, North Dakota argues that it has an interest in defending the "validity of its own statutes and regulations, which, if Plaintiffs are successful, would be subject to revision by EPA." Id. But, like the validity of federal regulations, the validity of North Dakota's regulations is not currently before the Court. There is little need, therefore, for North Dakota's input on that subject. And North Dakota does not administer the provisions of federal law that are at issue here.